IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 20, 2004 Session

## STATE OF TENNESSEE v. J. D. JONES

**Direct Appeal from the Criminal Court for Claiborne County**
**No. 11,977     E. Shayne Sexton, Judge**

---

**No. E2003-01565-CCA-R3-CD - Filed July 9, 2004**

---

Following a jury trial, Defendant, J. D. Jones, was convicted of attempted second degree murder, a Class B felony, and the unlawful possession of a weapon, a Class C misdemeanor.  At the conclusion of Defendant's sentencing hearing, the trial court sentenced Defendant to ten years for the attempted second degree murder conviction and thirty days for the misdemeanor conviction.  The trial court ordered Defendant's sentences to run concurrently.  On appeal, Defendant argues (1) that the evidence was insufficient to support his convictions; (2) that the prosecution engaged in improper conduct during Defendant's cross-examination; (3) that the trial court erred in failing to order a gunshot residue test of the samples taken from Defendant's hands; (4) that the trial court erred in not considering Defendant's health as a mitigating factor in determining Defendant's sentence; and (5) that the trial court erred in its instruction to the jury on the mens rea element of the offense of attempted second degree murder.  After a thorough review of the record in this case, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and JOE G. RILEY, JJ., joined.

James D. Estep, III, Tazewell, Tennessee; and Dirk A. Daniels, Rutledge, Tennessee, for the appellant, J. D. Jones.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William Paul Phillips, District Attorney General; Jared Effler, Assistant District Attorney General; and Todd Longmire, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual Background.

Billy Davidson, a police officer with the Tazewell Police Department, said that he had investigated an altercation on May 3, 2001, involving Defendant's son, Daniel Jones, and two other men. Mr. Jones was taken to the hospital as a result of injuries sustained during the fight, and Mr. Jones' wife, Amanda, was also struck during the fight. Mr. Jones identified one of his assailants as Aaron Eads and took out a warrant for Mr. Eads' arrest. Some time later, Mr. Jones told Officer Davidson that he had heard that the second assailant was Damon Bussell. Officer Davidson said that Mr. Eads was known to associate with Mr. Bussell, Dennis Parker, and Bradley Collins.

On cross-examination, Officer Davidson said he was one of the officers who also investigated the shooting incident involving Defendant which occurred on May 24, 2001. Officer Davidson said that the inconsistencies between the various participants' statements about the incident caused him to have some initial questions and conceded that it was possible that Defendant shot Mr. Parker in self-defense.

William Chadwell was working at the New Tazewell Package Store on May 24, 2001. Mr. Chadwell said that Mr. Bussell, Mr. Collins and Mr. Parker were in the store for two to three hours that afternoon throwing darts. Defendant entered the store at some point, bought a six-pack of beer, and talked with Mr. Bussell for about fifteen minutes. Mr. Chadwell described the men's conversation as "polite and quiet." Mr. Chadwell had not seen Defendant in the store before. Mr. Chadwell said that Mr. Parker was the only one of the three men drinking that afternoon.

Mr. Collins testified that he and Mr. Bussell arrived at the package store on the day of the incident in the early afternoon. Around 3:00 p.m., they left to pick up Mr. Bussell's paycheck. They gave Mr. Parker a ride back to the package store. The three men threw darts for a couple of hours after they returned to the store. Defendant came into the package store while they were throwing darts and talked with Mr. Bussell for five to ten minutes. Defendant then left the store. Mr. Collins said that he had met Defendant on one prior occasion at Defendant's pawn shop.

Mr. Collins said that after they finished throwing darts, the three men went to McDonald's to get something to eat. While they were parked in the drive-through lane, Defendant passed them in his vehicle. Mr. Collins said that Defendant was driving slowly. The men then drove to "Granny" Mabe's house. Mr. Bussell got out while Mr. Collins and Mr. Parker stayed in the car eating their hamburgers. Defendant pulled in behind them. Mr. Collins said that Mr. Bussell leaned in the car and said that Defendant wanted to talk to him. In a couple of minutes, Mr. Collins heard the sounds of a scuffle behind the car. When he got out of the car, Mr. Collins said that Defendant pointed a gun at him and told him not to get involved in the fight. Despite Defendant's gun, Mr. Collins joined the fight. Mr. Collins said that Daniel Jones and his brother, Joseph Jones, were on top of Mr. Bussell. Mr. Collins tried to pull one of the brothers off of Mr. Bussell and then heard a gunshot. Mr. Collins said he turned around and saw Defendant with his left arm around Mr. Parker's head.

Defendant was pointing a gun toward Mr. Parker's chest with his right hand. After he shot Mr. Parker, Mr. Collins said that Defendant put the gun down, and Daniel Jones went into the Mabe's residence to call 911. Defendant said, "Look what you boys made me do."

On cross-examination, Mr. Collins said that he did not know either Joseph or Daniel Jones. He agreed that Defendant's conversation with Mr. Bussell in the package store appeared to be casual, and Defendant was not angry or threatening. He did not see the Jones brothers' car at McDonald's.

Mr. Collins denied that he knew that Ms. Mabe sold liquor out of her home, and said that Mr. Bussell got out of the car at her house to use the bathroom. Mr. Collins said there were no other cars in the driveway when they first arrived. Defendant drove up in two or three minutes and parked about fifteen feet behind his car. Mr. Collins did not see Defendant's sons pull up but said that their car was parked about twenty-five feet behind Mr. Collins' car. Mr. Collins said that Defendant was just pointing, not aiming, his gun. Mr. Collins said that he was scared when he saw Defendant's gun but went up to the scene of the fight anyway because he thought that Defendant would miss him if he fired the gun. Mr. Collins said that Mr. Parker tried to keep Defendant from coming up to the fight but he did not see Mr. Parker hit or kick Defendant. Mr. Collins said he heard the gunshot about one to two minutes after he reached the fight.

Mr. Bussell testified that he knew Defendant because he had previously been a customer in Defendant's pawn shop but did not know Defendant's sons. Mr. Bussell denied that he had been involved in the earlier altercation with Daniel Jones and Mr. Eads.

Mr. Bussell said that Defendant watched while the men played darts at the package store. Defendant patted Mr. Bussell on the back and said he was a good thrower. Mr. Bussell and the other two men left the package store between fifteen to thirty minutes after Defendant. He said that Defendant drove past them at McDonald's and slowed down when he reached the passenger side of Mr. Collins' car.

Mr. Bussell said he went inside Ms. Mabe's to buy some liquor, but she did not have the right change, and he left without making a purchase. As he walked back to Mr. Collins' car, Defendant called Mr. Bussell over to his truck. Defendant asked if Mr. Bussell knew the two men behind him. Mr. Bussell turned around and saw that one of the men was "raring back" to hit him. Mr. Bussell started running up the hill, but the two men caught up with him and began kicking and punching him. After Mr. Collins pulled one of the men off of him, Mr. Bussell heard the gunshot. He saw Defendant with Mr. Parker behind him. Mr. Bussell told Mr. Parker to get down on the ground because he had been shot and then called 911. After the shooting, Mr. Bussell said, Defendant was walking around complaining about his "heart pain," and then Defendant laid down on the ground on top of his gun. Defendant told the group that Mr. Parker had shot himself, and Mr. Parker said that Defendant had shot him. Mr. Bussell said that neither Defendant nor his sons offered to help Mr. Parker. The incident lasted about three or four minutes.

On cross-examination, Mr. Bussell admitted that Aaron Eads had told him about the fight with Daniel Jones on May 3, but he said that he did not know that Amanda Jones had also been hit. Mr. Bussell denied that he knew Defendant's sons prior to May 24, and he did not know why Daniel and Joseph Jones hit him. Mr. Bussell said that he was on the ground until Mr. Collins pulled one of the men away, and he did not see either Mr. Parker or Defendant until after the shooting when he saw Mr. Parker staggering backwards behind Defendant.

Dennis Parker confirmed the sequence of events described by Mr. Collins and Mr. Bussell up to the point that the three men arrived at Ms. Mabe's house. Mr. Parker said that he got out of the car when he heard the sounds of a struggle and had started up the hill to help Mr. Bussell when he was hit in the mouth. Mr. Parker said that the blow knocked one of his teeth out. He remembered turning around, and then the next thing he knew, he was sitting on the ground with a gunshot wound in his chest. Mr. Parker said that Defendant tried to force some brass knuckles on his hand, but Mr. Parker would not let him. Mr. Parker said he did not know what happened to the brass knuckles. Mr. Parker said that Defendant told Ms. Mabe that Mr. Parker had shot himself. Mr. Parker said the did not know either Defendant or his sons and was unarmed at the time of the incident.

On cross-examination, Mr. Parker said that he did not see Defendant point a gun at Mr. Collins. Mr. Parker said that Defendant did not grab him, and he did not know if Defendant hit him with the brass knuckles. Mr. Parker denied hitting or kicking Defendant and said that he was not aware that Mr. Bussell took anything from his shirt pocket.

Richard Arnwine, a police officer with the Tazewell Police Department, arrived at the scene at 6:23 p.m. He found Defendant and Mr. Parker lying on the ground, their bodies nearly touching. Officer Arnwine did not notice any injuries on Mr. Parker's hands or knuckles. He said that Defendant had a spot of blood on his right knuckle and a small gash above his right eye. Mr. Bussell and Mr. Collins were attempting to apply pressure to Mr. Parker's wound to stop the flow of blood.

Officer Arnwine retrieved a .38 revolver from beneath Defendant. The gun had one spent cartridge and four live cartridges in the cylinder. A second .38 revolver was found in Defendant's truck inside the console with five live rounds in the chamber. Two gun cases and several cartridges were beneath the driver's seat. Officer Arnwine found a six-pack of beer, cell phones, and a walkie-talkie inside Defendant's truck.

Officer Arnwine said that Defendant complained of stomach pain at the scene. Officer Arnwine said that Defendant was cooperative when he told Defendant to get off of the gun. Officer Arnwine said that he did not notice a "for sale" sign in the pick-up truck parked near Ms. Mabe's house. Officer Arnwine knew that Defendant owned a pawn shop and had a federal license to buy and sell handguns. He said that he retrieved a bag of marijuana from Mr. Parker's clothes at the hospital but did not find any brass knuckles.

Officer Arnwine admitted that he was not sure what criminal offense to charge Defendant with at first, based on the participants' statements. Officer Arnwine said that he would not have

ultimately brought charges, however, if he thought Defendant acted in self-defense. Officer Arnwine was aware that someone had taken gun residue samples from Defendant's hands, but the TBI did not think it was necessary to test the sample based on the circumstances surrounding the incident.

Russell Davis, a forensic scientist with the TBI, testified that he would not be able to tell which hand fired the weapon from a gunshot residue test. The test would only show that the subject had fired, handled or stood near a gun that was discharged. For a small caliber weapon, Mr. Davis defined "near" as a few inches.

Dr. Robert Bechtel was the emergency treating physician for both Mr. Parker and Defendant. Dr. Bechtel said that Dr. Thomas inserted a tube into Mr. Parker's chest to alleviate his respiratory difficulties and monitor blood loss. At that point, the wound was not bleeding externally, but Dr. Bechtel was concerned with internal bleeding. Dr. Bechtel said that the bullet entered at a forty-five degree angle and traveled horizontally through Mr. Parker's body. Mr. Parker was sent to The University of Tennessee Hospital by helicopter approximately forty-five minutes after arriving at the Claiborne County Hospital.

On cross-examination, Dr. Bechtel said that Defendant told him he had been kicked during the incident and complained of pain in his lower abdomen and back. Defendant had some abrasions on his hands, some minor lacerations on his right hand, a minor bruise on the right side of his forehead, and a two-inch abrasion on the top of his head. Dr. Bechtel believed that the head abrasion was caused by a glancing blow that could have been a knuckle or an object. Because Defendant had previously had abdominal surgery, Dr. Bechtel was concerned that some of the adhesions had become dislodged. Defendant was admitted to the hospital for observation.

On redirect, Dr. Bechtel said that he did not see any bruising in the abdominal, lumbar or left gluteal area. The lacerations to Defendant's hand did not need stitches and could have been caused by the gravel outside Ms. Mabe's home. Although he was limping, Defendant walked into the emergency room unassisted and appeared alert and oriented.

The defense first called T. J. McClanahan. Mr. McClanahan said that Defendant wanted to buy an old truck. Mr. McClanahan told Defendant on the day of the altercation that there was a truck for sale at Ms. Mabe's house. Mr. McClanahan said that he had seen Mr. Bussell, Mr. Parker and Mr. Collins at McDonald's before the incident and they looked like a "gang" to him.

Joseph Jones said that he worked at his father's pawn shop. On the day of the incident, he and his father worked a little later than usual and left around 6:00 p.m. Daniel Jones had stopped by the shop around 5:00 p.m. Joseph Jones and Daniel Jones first drove to Raceway Gas with Defendant following them in his truck. They next went to Long John Silver's, and then drove toward Ms. Mabe's house to look at a truck that was for sale. Daniel Jones missed the turn and pulled into McDonald's to turn around. Joseph Jones said that he did not see Mr. Bussell, Mr. Collins or Mr. Parker in the parking lot. He said that he discussed the directions to Ms. Mabe's house with his father by walkie-talkie.

Joseph Jones said that his brother got out of the car first when they reached Ms. Mabe's house and he followed Daniel Jones when he walked over to Defendant's truck. Mr. Bussell was already standing next to the truck. Mr. Bussell and Daniel Jones exchanged some words and then started fighting. Joseph Jones said that he did not hit Mr. Bussell but was just trying to keep him away from his brother. Mr. Collins came up and hit Joseph Jones in the head, and the two of them started fighting. Joseph Jones explained that there were really two separate fights going on. He did not see either Mr. Parker or Defendant before he heard the gunshot. After the gun was fired, Joseph Jones saw Defendant holding his stomach and trying to apply pressure to Mr. Parker's wound. Defendant asked Mr. Collins to help him. After Mr. Parker was shot, Joseph Jones said that Mr. Bussell pulled a clear plastic baggie from Mr. Parker's shirt pocket. Joseph Jones said that he did not see Mr. Parker kick Defendant.

On cross-examination, Joseph Jones admitted that he, Defendant, and Daniel Jones had discussed the May 3 altercation, but he said that he did not remember his brother telling them that he thought Mr. Bussell was involved. Joseph Jones admitted that he had lived in Claiborne County all his life but insisted that they simply missed the turn to Ms. Mabe's house and had to turn around at McDonald's. Joseph Jones said that he was not aware that the road immediately after the missed road also led to Ms. Mabe's house. He said that his brother wanted to get a hamburger at McDonald's but later admitted that nobody bought food at either Long John Silver's or McDonald's. Mr. Jones said that he did not tell the district attorney prior to trial that Mr. Bussell pulled something out of Mr. Parker's pocket.

Dr. Carroll Rose had been Defendant's surgeon since 1998. Dr. Rose said that he had performed several surgeries on Defendant including a bilateral vasectomy, a repair of a ruptured umbilical hernia, a bowel resection and a colonoscopy. Dr. Rose last saw Defendant before the incident in October, 2000, as a routine follow-up visit following the colon resection. After his check-up, Defendant's only physical restriction was to avoid lifting heavy objects. Dr. Rose saw Defendant about twenty-four hours after the incident but did not notice any discoloration, bruising or cuts.

Daniel Jones testified that he and his wife, Amanda, went to McDonald's on May 3, 2001. As they pulled into the drive-through lane, another car pulled in behind them, and the occupants started cursing at them. Daniel Jones got out of his car, and one of the men swung his fist at him. The second person started kicking Daniel Jones. Daniel Jones' wife came to his assistance, and one of the men kicked her in the stomach. Ms. Jones was able to drive her husband to the hospital when the fight was over.

Daniel Jones said that he learned from the police that one of his assailants was Aaron Eads, but he never found out who was driving the car. Daniel Jones said that Mr. Bussell was already standing by Defendant's truck when he and his brother arrived at Ms. Mabe's house on May 24, 2001. Mr. Bussell told Daniel Jones that he knew who he was because he had beaten him up before. Mr. Bussell then threw a punch at him. Daniel Jones denied that he followed Mr. Bussell to Ms. Mabe's house.

-6-

Daniel Jones said that he did not see Defendant with a gun that day, and he did not see Defendant with his arm around Mr. Parker's head. Daniel Jones said that Mr. Bussell kicked Defendant in the stomach and Defendant tried to get away from him.

On cross-examination, Daniel Jones denied that he told Officer Davidson that he thought Mr. Bussell was involved in the May 3 altercation. He admitted that he did not tell Officer Arnwine or testify at the preliminary hearing that he saw Mr. Parker kick his father or that he saw Mr. Bussell remove a baggie from Mr. Parker's shirt pocket.

Defendant then testified on his own behalf. He said that he obtained a federal license to buy and sell handguns about six years prior to the incident. Defendant said that he carried a gun because the nature of his business was susceptible to robberies. Defendant admitted that he did not have a state permit to carry a gun. He said that he did not think a state handgun permit was necessary to carry his weapon when he held a federal license.

Defendant said that he and his sons left the pawnshop and drove in separate cars to the Raceway gas station. Defendant left the gas station first and stopped at the package store to buy a six-pack of beer for his fiancé. Defendant said that he had a casual conversation with Mr. Bussell in the package store. After that, he and his sons started for Ms. Mabe's house to look at a truck. His sons' truck was in front of him, and Daniel Jones missed the road leading to Ms. Mabe's house. He and his sons were discussing the directions by walkie-talkie. Defendant said they turned into McDonald's, parked a minute to discuss what they should do, and then drove back to the right road.

When they arrived at Ms. Mabe's house, Mr. Bussell walked up to his truck and asked Defendant what he was doing. At that point, Daniel Jones came over to the truck. Mr. Bussell told Daniel Jones that he knew him and then shoved him. Daniel Jones and Mr. Bussell ran up the hill with Joseph Jones behind them. Defendant told the men to stop fighting or he was going to call the police. Defendant denied that he had his gun out at this point. Defendant started to return to his truck when he was hit over the head. He fell to his knees, and Mr. Parker started kicking him. Defendant begged Mr. Parker to leave him alone, but Mr. Parker told Defendant he was going to kill him. Defendant pulled his gun out as he was trying to crawl away. Defendant said that he knew Mr. Parker was going to kill him by the look in his eyes. Defendant switched his gun to his left hand and shook his right hand at Mr. Parker. Defendant fired one shot, and Mr. Parker fell to the ground. Defendant said that he did not want to hurt anyone and did not want Mr. Parker to die. Defendant said Mr. Bussell pulled a baggie out of Mr. Parker's shirt pocket before the ambulance arrive.

On cross-examination, Defendant said that Officer Davidson told him before the shooting that Mr. Bussell was Mr. Eads' friend, but Defendant said Daniel Jones could not identify Mr. Bussell as the second assailant from a photograph. Defendant denied that he was upset when the police did not find the second assailant. He admitted, however, that he called the district attorney's office but denied that he told the prosecutor that he would "just take care of it myself." Defendant said that Mr. Parker was behind and to the side of Defendant, and Defendant was holding the gun behind his back when he fired. Defendant denied that he said that Mr. Parker shot himself.

Defendant admitted that he had not described how he shot Mr. Parker in his initial statement to the police. Defendant said that he put the gun underneath himself to prevent one of the other men from grabbing it. Defendant said that he did not intend to kill Mr. Parker, and did not want to hurt him.

## II. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the State in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

### A. Attempt to Commit Second Degree Murder

Defendant argues that the evidence was insufficient to support his conviction for attempted second degree murder because the State failed to prove that Defendant acted with the requisite intent. Defendant submits that there is a distinction between a "result-of-conduct" offense and a "nature of the circumstances" offense. *See State v. Page*, 81 S.W.3d 781 (Tenn. Crim. App. 2002); *see also* the discussion in Part V, *supra*. Second degree murder is a "result of conduct" offense. *Id.* at 787. Defendant argues that the State's reliance on evidence that merely showed the nature of the circumstances surrounding the shooting was insufficient to show that Defendant knew with reasonable certainty that the result of his conduct would be Mr. Parker's death.

Defendant was convicted of attempt to commit second degree murder. Second degree murder is defined as a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). One attempts to commit second degree murder when he or she acts with the intent to knowingly kill the victim, believing the conduct would cause the result without further conduct on his or her part. *Id.* §§ 39-12-101(a)(2) and 39-13-210(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). As discussed *supra*, because second-degree murder is a "result of conduct" offense, the trier of fact must find that Defendant was aware that his conduct was reasonably certain to cause the result and not simply aware of the nature of his conduct or the circumstances surrounding the conduct. *Page*, 81 S.W.3d at 788. This does not mean, however, as Defendant suggests, that the State may not meet its burden of proving that the defendant acted knowingly through evidence that shows the nature or circumstances of the offense. Intent is rarely proven by direct evidence, and the

trier of fact may deduce or infer intent from the character and nature of the offense and the circumstances surrounding the offense. *State v. Inlow*, 52 S.W.3d 101, 104-105 (Tenn. Crim. App. 2000).

In any event, the State in this instance relied on both direct as well as circumstantial evidence to show that Defendant acted knowingly. Although strongly contested, there was evidence that Defendant and his sons knew or believed that Mr. Bussell had been involved in the earlier altercation with Daniel Jones and his wife. Defendant's actions on the day of the shooting also support an inference by the jury that Defendant purposefully followed Mr. Bussell until he arrived at Ms. Mabe's house. Defendant admitted that he intended to shoot the victim and that he pulled out his gun during his struggle with Mr. Parker. Defendant said he warned Mr. Parker that he would shoot if Mr. Parker did not stop fighting, and when Mr. Parker ignored Defendant's warnings, Defendant fired his weapon. Viewing the evidence in a light most favorable to the State, the evidence was sufficient to support the jury's finding that Defendant attempted to knowingly kill Mr. Parker.

Alternatively, Defendant argues that the weight of the evidence is against the jury's finding that he did not act in self-defense in response to Mr. Parker's aggression. As applicable in this case, "[a] person is justified [against prosecution] in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force." Tenn. Code Ann. § 39-11-611(a). Whether Defendant acted in self-defense is a factual question for the jury as the trier of fact. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). This Court may not reweigh or reevaluate the evidence. *Bland*, 958 S.W.2d at 659. Based on the evidence presented, the jury could have either accredited Mr. Bussell's and Mr. Collins' testimony that Defendant and his sons instigated the fight or that, even if justified, the force used by Defendant was unreasonable based on the circumstances surrounding the incident. *Goode*, 956 S.W.2d at 527. In either event, it was the jury's prerogative to reject Defendant's defense of self-defense.

Based on the totality of the evidence presented in this case, we find that the evidence is sufficient from which a jury could conclude beyond a reasonable doubt that Defendant was guilty of attempted second degree murder.

## B. Unlawful Possession of a Weapon

Defendant argues that the evidence is insufficient to support his conviction for unlawful possession of a weapon with the intent to go armed. Defendant admits that he did not have a state handgun permit. Defendant submits, however, that he is licensed to carry a firearm by the federal government, and a state permit is therefore not required.

Defendant was a federally licensed firearms dealer at the time of the incident. *See* 18 U.S.C. § 922, *et seq.* The federal license permitted Defendant to engage in the business of dealing in firearms, including the shipment or receipt of firearms in interstate or foreign commerce. *Id.* § 923(a). Defendant's federal license also permitted him to sell firearms in Tennessee to qualified

purchasers. Tenn. Code Ann. § 39-17-1316. The primary purpose of the federal gun control legislation is to control the distribution of firearms through a system of licensed importers, manufacturers and dealers and specifically applies to pawnbrokers. 18 U.S.C. § 921(a)(11); *Huddleston v. United States*, 415 U.S. 814, 824, 94 S. Ct. 1262, 1268-69, 39 L. Ed. 2d 782 (1974). The federal license, however, is not a substitute for a state handgun permit nor does it authorize a dealer to carry a weapon with the intent to go armed in contravention of state law.

As charged in this case, it is an offense to carry a firearm with the intent to go armed. Tenn. Code Ann. § 39-17-1307(a)(1). The necessary intent to support a conviction may be proven by the circumstances surrounding the carrying of the weapon and depends on the facts of each particular case. *Cole v. State*, 539 S.W.2d 46, 49 (Tenn. Crim. App. 1976) (quoting *Hill v. State*, 298 S.W.2d 799 (Tenn. 1957)). Defendant was armed with a .38 revolver when he confronted Mr. Parker. A second revolver along with two gun cases and several rounds of ammunition were found in his car. Defendant admitted that he carried a loaded weapon but said he did so because of the nature of his pawn business. Defendant, however, did not meet any of the conditions that would serve as a defense to a conviction of this offense. Tenn. Code Ann. § 39-17-1308. The evidence was sufficient for the jury to conclude that Defendant unlawfully possessed the weapon with the intent to go armed.

## III. Prosecutorial Misconduct

Defendant argues that the prosecutor engaged in improper conduct when he in effect became a witness against Defendant during Defendant's cross-examination as illustrated in the following exchange:

> STATE: But you heard that it could have been Damon Bussell, correct?
>
> DEFENDANT: No, sir. We heard that he ran with Aaron Eads.
>
> STATE: And that made you think that it could have possibly been Damon Bussell with Aaron Eads, correct?
>
> DEFENDANT: No, sir, we actually thought Damon Bussell was the Bussells out of Forge Ridge. You know, we're [sic] got several of those that are customers, and they're all big boys, you know. They all – actually they look like him.
>
> STATE: But the fact that your son wasn't able to take out a warrant for the other assailant on your son, that upset you, didn't it.
>
> DEFENDANT: No, sir.

| | |
|---|---|
| STATE: | In fact – |
| DEFENDANT: | Now, if you're saying would I have liked to seen the guilty party caught, yes, sir, but you know if you're saying if you're upset, no, sir. |
| STATE: | And, in fact, you made several calls to the District Attorney's office inquiring about getting a warrant on this other person, did you not? |
| DEFENDANT: | I believe I talked to you. Yes, sir. |
| STATE: | And in fact you said, "I'll just take care of it myself." Didn't you? |
| DEFENDANT: | No, sir, I didn't. |
| DEFENSE COUNSEL: | Object. |
| STATE: | It goes to motive. |

At this point, the trial court asked counsel to approach the bench to discuss the exchange out of the hearing of the jury. The parties' discussion was not recorded. After the conference was concluded, the prosecutor resumed his cross-examination with a different line of questioning.

At the hearing on Defendant's motion for new trial, counsel attempted to reconstruct the discussion that occurred during the bench conference.

| | |
|---|---|
| DEFENSE COUNSEL: | My recollection is that we asked, first of all, for a dismissal during the conference because of the effect, the prejudicial affect. |
| THE COURT: | Are, are you saying a mistrial or a dismissal? |
| DEFENSE COUNSEL: | Yes, Your Honor, as we approached. |
| THE COURT: | Did, did we ever get that onto, onto the record. |
| DEFENSE COUNSEL: | No, Your Honor. And then, I think the remark was made by Your Honor that the Attorney General was awfully close to stepping over the line and that it should end at that point. |

-11-

| | |
|---|---|
| THE COURT: | Do you recall? |
| STATE: | And that's what happened. I did not return to the issue. And they were having concerns with the prosecutor being a witness, and that's why I explained to Your Honor that this statement was not made to me but was made to Kathy Henard, a victim/witness coordinator for Claiborne County, and I was not relying on any – |
| | This statement was not made to me personally. I was relying on the fact that I knew, knew this information from talking to a member of my staff. |
| THE COURT: | That, most likely, that, that is where my concern was, in terms of where you were going with it. |
| | How, how would you intend to prove it? Would you use extrinsic evidence through a member of your office, or, you know, and, and under what theory could you even get it in? |

The trial court then observed that it would not have granted a mistrial based on the prosecutor's line of questioning. The trial court did indicate, however, that it "most likely would have given a . . . very structured and pointed curative instruction to the jury so they would understand exactly what occurred and how they were to take that line of questioning, which was they should not take this line of questioning," implying that defense counsel did not request such an instruction. Ultimately, the trial court refused to grant Defendant's motion for new trial on this ground because it found the prosecutor's comments not "overly damaging."

Defendant has two hurdles in seeking review of this issue. When defense counsel makes an objection, the objection must be contained in the record, and it is counsel's responsibility to insure that a transcript is made of all of the proceedings relevant to the objection in order "to convey a fair, accurate and complete account of what transpired with respect to those issues that are the basis of the appeal." Tenn. R. App. P. 24(b). Moreover, counsel must "take whatever action [is] reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(b). Although not entirely clear from the record, it appears that Defendant did not ask for a curative instruction following the prosecutor's statements. This normally would result in a waiver of the issue on appeal. *State v. Jones*, 733 S.W.2d 517, 522 (Tenn. Crim. App. 1987). However, even if not waived, it appears that Defendant would not be entitled to relief.

Clearly, the prosecutor's remark that Defendant said that "he would take care of it" was testimonial in nature and offered to rebut Defendant's testimony that he was not upset that the second assailant in the May 3 altercation involving his son was not found or arrested. It is improper,

however, for a prosecutor "to testif[y] not only to facts outside the record but also to matters within his personal knowledge as the chief law enforcement official in the county." *Judge v. State*, 539 S.W.2d 340, 345 (Tenn. Crim. App. 1976). The prosecutor, in effect, became a witness for the State and placed his credibility before the jury. *State v. Smith*, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990); *Judge*, 539 S.W.2d at 345. The inappropriateness of the prosecutor's conduct is compounded by his later disclosure at the hearing on Defendant's motion for new trial that he actually had no personal knowledge of what Defendant said. When no steps were taken to correct Defendant's recollection of the conversation, the jury was left with the impression that Defendant personally told the prosecutor that "he would take care of it."

A review of prosecutorial misconduct, however, is a two-part test. Having found that the prosecutor's line of questioning was improper, we must next determine if the comments were so prejudicial to Defendant as to invalidate his conviction. *Judge*, 539 S.W.2d at 343. The following factors are considered in determining whether the prosecutor's improper conduct could have affected the verdict to Defendant's detriment:

1. the conduct complained of in light of the facts and circumstances of the case;
2. the curative measures undertaken;
3. the intent of the prosecutor in making the improper remarks;
4. the cumulative effect of the improper conduct and any other errors in the record; and
5. the relative strength or weakness of the case.

*Id.* at 344.

Defendant voluntarily offered the testimony that he believed he spoke directly with the prosecutor. Without doubt, this portion of Defendant's cross-examination leaned in favor of the State's theory that Defendant and his sons instigated the fight with Mr. Bussell and his friends in retaliation for the earlier altercation involving Daniel Jones and his wife. The intent of the prosecutor in this instance, however, is difficult to assess from the record. It appears that his attention was focused on Defendant's prior inconsistent statements about his feelings toward the earlier fight and not on Defendant's voluntary, albeit erroneous, comment about whom he thought he spoke with. It is likely that Defendant's comment was just as much a surprise to the prosecutor, who knew he had not spoken with Defendant, as no doubt it was to trial counsel. Based on the limited record before us, we cannot say that the prosecutor was improperly motivated during his cross-examination. Moreover, although the prosecutor did not correct the impression left by Defendant, neither did he elaborate on the testimony. The prosecutor promptly dropped this line of questioning following the bench conference. Considering the factors that can be gleaned from the limited record before us in conjunction with the *Judge* considerations, including the strength of the State's case, we are not compelled to find reversible error. Defendant is not entitled to relief on this issue.

**IV. Gunshot Residue Test**

Defendant's hands were "swabbed" for gunshot residue after the incident, but the swabs were not submitted to the Tennessee Bureau of Investigation for testing. Defendant argues that the failure of the State to complete the testing process violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and that the trial court erred in not compelling the State to submit the swabs for testing. Defendant contends that the test's results would have corroborated his testimony that he shot Mr. Parker with his left hand, or weaker hand, rather than his right hand.

On the day before trial, Defendant filed a motion to compel the State to submit the gun residue swabs for testing and requested the trial court to grant a continuance until receipt of the test's results. The trial court conducted a hearing on Defendant's motion by telephone conference and denied Defendant's motion. The telephone conversation was not recorded. Once again, we note that we are unable to review an issue without an adequate record as to what transpired with respect to that issue. Tenn. R. App. P. 24(b); *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). In the absence of a record of the hearing, we must presume that the trial court's ruling is correct. *See State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981).

Nonetheless, even if not waived, we find no *Brady* violation. In order to show a *Brady* violation, defendant must prove (1) that the prosecutor suppressed the evidence; (2) that the suppressed evidence was favorable for the defense; and (3) that the suppressed evidence was material. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). *Brady*, however, does not require the State to investigate for the defendant. *State v. Reynolds*, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984). At the hearing on Defendant's motion for new trial, the State said that it did not request a gun residue test because Defendant admitted he fired the gun. Agent Davis testified at trial that a gun residue test could not identify which hand was used to fire the weapon, only that the subject fired, handled, or was simply near a gun that was discharged. The State was never in possession of the results of any gunshot residue tests either before or during trial. Defendant is not entitled to relief on this issue.

**V. Jury Instructions on "Knowing"**

Relying on *State v. Page*, 81 S.W.3d 781 (Tenn. Crim. App. 2002), Defendant argues that the trial court erred in its instruction to the jury on the definition of the "knowing" mental state required to support a conviction of attempted second degree murder.

The trial court instructed the jury on the offense of attempted second degree murder as follows:

> For you to find a person guilty of criminal attempt, the State must have proven
> beyond a reasonable doubt the existence of the following essential elements: number
> one that the defendant intended to commit the specific offense of second degree

murder, and number two that the defendant did some act intending to complete a course of action or cause a result that would constitute second degree murder under the circumstances as the defendant believed them to be at the time, and his actions constitute a substantial step toward the commission of second degree murder. . .

The essential elements that are necessary to constitute second degree murder are: number one that the defendant unlawfully killed the alleged victim and number two that the defendant acted knowingly. Intentionally means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause a result.

Knowingly means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the conduct – with respect to result of the person's conduct when the person is aware that the conduct is reasonably certain to cause a result. The requirement of knowingly is also established if it is shown that the person acted – the defendant acted intentionally.

Defendant did not object to the trial court's jury instructions and did not raise the issue in his motion for new trial. Even if properly raised, however, we would have concluded that the error was harmless.

Second degree murder is a result-of-conduct offense. *Page,* 81 S.W.3d at 788, *citing State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). That is, "the culpable mental state accompan[ies] the result as opposed to the nature of the conduct." *Ducker*, 27 S.W.3d at 896. As Defendant argues, a jury instruction that combines the mental culpability for a result-of-conduct offense with that required for a nature of the conduct offense is erroneous. *Page*, 81 S.W.3d at 788. The danger lies in the possibility that the jury will determine guilt based upon a finding as to the wrong mental culpability thereby impermissibly lessening the State's burden of proof. *Id.*

This Court also observed in *Page*, however, that *a mens rea* jury instruction similar to the one in the case *sub judice* would be harmless error in many homicide cases. *Page*, 81 S.W.3d at 789. *See also State v. Abel Caberra Torres,* No. M2001-01412-CCA-R3-CD, 2003 WL 21349921 (Tenn. Crim. App., Nashville, June 10, 2003), *no. perm. to appeal filed*; *State v. Theron Davis*, No. W2002-00446-CCA-R3-CD, 2003 WL 21339000 (Tenn. Crim. App., Jackson, May 28), *perm. to appeal denied* (Tenn. 2003). For example, a similar *mens rea* instruction may be harmless if the defendant's conduct leaves no question open that he intended the victim's death as a result of his actions. *See State v. Robert Kern Holloway*, No. 2002-01904-CCA-R3-CD, 2003 WL 22142497 (Tenn. Crim. App., Nashville, Sept. 17), *perm. to appeal denied* (Tenn. 2003) (Defendant stalked the unarmed victim, stabbing him on multiple occasions each time the victim paused in his flight.); *State v. Allen Lee Dotson, Sr.*, No. M2001-01970-CCA-R3-CD, 2002 WL 31370471 (Tenn. Crim. App.,

Nashville, Oct. 21, 2002), *perm. to appeal denied* (Tenn. 2003) (After shooting the victim twice, Defendant walked up to the prone victim and shot him in the head). In both instances, the defendant's conduct was such that his actions were reasonably certain to cause the victim's death, and the erroneous jury instruction on the definition of "knowingly" was therefore harmless error. In other words, if the trial court had provided the proper instruction, the jury would not have reached a contrary result. *See also State v. Tony Martin*, No. W2001-02221-CCA-R3-CD, 2003 WL 261937 (Tenn. Crim. App., Jackson, Feb. 7), *perm. to appeal denied* (Tenn. 2003).

In the case *sub judice*, Defendant did not deny that he shot the victim in the chest during a volatile situation. The issue before the jury was not Defendant's mens rea at the time of the shooting, but whether or not he shot the victim in self-defense. We have previously observed that a defendant's claim of self-defense does not necessarily render a jury instruction containing an erroneous definition of "knowingly" harmless. *See Page*, 81 S.W.3d at 789. In this instance, however, Defendant clearly chose to leave the jury with an "all or nothing" situation as a trial strategy by specifically declining to request an instruction on lesser-included offenses. Once the jury rejected Defendant's defense, they were left with conduct clearly evidencing an awareness that death was reasonably certain to occur if the defendant fired his weapon under the scenario presented in the case. *See Martin*, 2003 WL 261937.

Based upon a thorough review of the record, we conclude that the trial court's instruction to the jury on the definition of "knowingly" as to the charge of attempted second degree murder was harmless error beyond a reasonable doubt. Defendant is not entitled to relief on this issue.

## VI. Sentencing Issues

Defendant testified at his sentencing hearing that he suffered from a gastrointestinal disorder that had required two previous surgeries. A third surgery was pending but unscheduled at the time of the hearing. Defendant also said that he was supposed to have back surgery in the near future. Defendant said that he needed two medicines for his breathing problems, suffered from bowel troubles and was currently seeing a cardiologist. Defendant said that he was experiencing numbness in his hands and arms because of a bulging disc, and the numbness limited his ability to work. Defendant saw his physician two or three times a month because of his health problems. He took numerous medications for pain, high blood pressure, nerves, his stomach problems and asthma. Defendant also said that he needed a special mattress to sleep on because of his weight. Defendant said that he experiences numbness and difficulty in walking if he does not sleep on the mattress.

At the conclusion of the sentencing hearing and after consideration of the sentencing principals, the trial court applied enhancement factor 10, that Defendant used a firearm during the commission of the crime. Tenn. Code Ann. § 40-35-114(10). In mitigation of Defendant's sentence, the trial court found that Defendant's conduct was not motivated by a sustained intent to violate the law. *Id.* 40-35-113(11). The trial court did not consider Defendant's physical health as a mitigating factor in determining the length of his sentence. The trial court found that the enhancing factor outweighed the mitigating factor and sentenced Defendant to ten years as a Range I offender for his

conviction for attempted second degree murder, a Class B felony. Defendant does not appeal his thirty-day sentence for his conviction of the unlawful possession of a firearm.

On appeal, Defendant argues that the trial court erred in not considering his poor health as a mitigating factor . If his health is considered, Defendant argues that the length of his sentence should be the minimum of the range, or eight years.

When a defendant challenges the length or the manner of service of his or her sentence, this Court must conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d); *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). This presumption, however, is contingent upon an affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). If the record fails to show such consideration, the review of the sentence is purely *de novo*. *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determinations the trial court must consider: (1) the evidence presented at the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any appropriate enhancement and mitigating factors; (6) the defendant's potential or lack of potential for rehabilitation or treatment; and (7) any statements made by Defendant in his own behalf. Tenn. Code Ann. §§ 40-35-103 and -210; *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995). If the trial court has imposed a lawful sentence by following the statutory sentencing procedure, given due consideration and proper weight to the factors and sentencing principles, and made findings of fact adequately supported by the record, this Court may not modify the sentence even if it would have preferred a different result. *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing that his sentence is improper. Tenn. Code Ann. § 40-35-401(d) Sentencing Commission Comments; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The weight placed on one factor by the trial court may vary from that assigned to another, and the legislature has specifically declined to assign a numerical value to mitigating and enhancement factors. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; *State v. Spratt*, 31 S.W.3d 587, 606 (Tenn. 2000). The weight accorded enhancement and mitigating factors is within the trial court's discretion so long as the record supports its findings and the findings comply with sentencing principles. *State v. Kelly*, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000).

Defendant was convicted of attempted second degree murder, a Class B felony. As a Range I, standard offender, the sentencing range for a Class B felony is not less than eight years nor more than twelve years. Tenn. Code Ann. § 40-35-112(a)(2). The presumptive sentence for a Class B felony is the minimum sentence in the range if there are no enhancement or mitigating factors. *Id.* § 40-35-210(c). Should there be enhancement but no mitigating factors, the trial court may set the sentence above the minimum but still within the range. *Id.* -210(d). If both enhancing and

mitigating factors are present, the trial court must start at the minimum sentence of the range, enhance the sentence within the range as appropriate for the enhancing factors, and then reduce the sentence as appropriate for the mitigating factors. *Id*. § -210(e).

Defendant argues that the trial court erred in not considering Defendant's health problems in mitigation of his sentence under the catch-all subsection which allows consideration of "any other factor consistent with the purposes of this chapter." *Id*. 40-35-113(13). The trial court, however, is not required to do so, and Defendant does not offer any arguments as to why his health should reduce the length of his sentence other than the suggestion that confinement might interfere with his medical treatment. This Court has previously observed that poor health by itself should not generally be considered a mitigating factor. *See State v. Anthony Raymond Bell*, No. 03C01-9503-CR-00070, 1996 WL 103765 (Tenn. Crim. App., Knoxville, Mar. 11), *perm. to appeal denied* (Tenn. 1996). To base the length of a defendant's sentence on the status of his health would frustrate the purposes of the Sentencing Act to serve as a general deterrent to those likely to violate the criminal laws of this State. Based upon the facts presented in this case, consideration of Defendant's health is not appropriate for this offense. We find that the trial court did not err in declining to consider Defendant's health as a mitigating factor in determining the length of his sentence.

Based on the presence and weight accorded the one enhancement factor, we conclude that Defendant's sentence of ten years was appropriate.

## CONCLUSION

Based upon a thorough review of the record, we affirm the trial court's judgment.

_____
THOMAS T. WOODALL, JUDGE